OPINION
This case is before us on the appeal of Creative Sunroom Designs, Inc. (Creative) from a judgment in the amount of $2,931.98, plus costs, in favor of Staffco Construction, Inc. (Staffco). The dispute between Creative and Staffco arose in connection with a renovation project at Masgig Middle School in Centerville, Ohio. Staffco prepared a bid for the Masgig project as a general contractor. According to the architect's specifications, three prefabricated greenhouse window units manufactured by Four Seasons were to be included in the bid. Because Creative was the local retailer for Four Seasons, Staffco's project manager, Susan Reenan, called Creative about submitting a bid for the greenhouse windows. Subsequently, Creative gave Staffco a bid of $14,498 for materials and labor. Staffco then used this bid as part of its overall bid on the project. After Staffco was awarded the project, Creative wanted more money for the greenhouse windows. When the matter could not be resolved, Staffco used a different window manufacturer and installer, and sued Creative for the additional expenses that were incurred.
Following a bench trial, the court found that Staffco had reasonably relied on Creative's bid and that the terms of the subcontract bid would be enforced under the doctrine of promissory estoppel. Creative now appeals, claiming as its single assignment of error that the trial court erred in finding Creative liable to Staffco. To support this assignment of error, Creative raises two issues. First, Creative contends that promissory estoppel cannot be used to alter the terms of a bid proposal submitted by a subcontractor to a general contractor. Second, Creative claims the trial court abused its discretion in this case by finding that Staffco reasonably interpreted the subcontract bid to include terms and specifications in the specification book. We find both these arguments without merit and affirm the judgment of the trial court.
 I
As a preliminary point, we note that Creative has classified its promissory estoppel argument as one of "law," not fact. This potential distinction is important, because if a legal question is involved, we can substitute our judgment for that of the trial court. See, e.g., Lewis v. Ohio Real Estate Comm. (1997),121 Ohio App.3d 23, 28. On the other hand, we must give deference to factual findings, since the trial court has a better opportunity to assess credibility. Gibson v. Gibson (Mar. 26, 1996), Clark App. No. 95CA87, unreported. After considering the matter, we believe Creative's promissory estoppel argument is factual, not legal.
In this regard, we note that Creative concedes that promissory estoppel may bind a subcontractor to the terms of its original offer. This is consistent with the trial court's decision, which relied on the principle that:
 [a] subcontractor who makes a `bid' or `quote' which constitutes an offer to a general contractor, who submits a bid in reliance upon such offer, is bound to perform in accordance with the terms of that offer when the general contractor (1) is awarded the contract and (2) within a reasonable time thereafter notifies the subcontractor that the offer is accepted.
Wargo Builders, Inc. v. Douglas L. Cox Plumbing Heating, Inc.
(1971), 26 Ohio App.2d 1. See also, R.P. Carbone Constr. Co. v.N. Coast Concrete (1993), 88 Ohio App.3d 505. Despite agreeing with this general proposition, Creative says promissory estoppel is inapplicable because Staffco added terms and work to the original contract.
We consider this a fact-based argument, i.e., it depends on a choice between conflicting versions of the facts. For example, the trial testimony of Dale Thornberry, Creative's President, supports the claim that Staffco added to the original bid. By contrast, testimony from Staffco witnesses conflicts with Thornberry's account and supports a finding that Creative should be bound by the bid it submitted. Therefore, we interpret Creative's argument, regardless of how it is phrased, as a claim that the trial court decision was against the weight of the evidence. Our role in that event is to decide if the trial court's judgment is supported by "some competent, credible evidence going to all the essential elements of the case." Reed v.Key-Chrysler Plymouth (1998), 125 Ohio App.3d 437, 439 (citations omitted).
The dispute in the present case is based on the fact that Creative's original bid did not include the price of awning or vented windows, as required by the Masgig project specifications and plans. In this context, the following facts (and contested facts, where noted) are pertinent. After Staffco's project manager, Susan Reenan, first contacted Creative about a bid, she sent Creative some project specifications for the greenhouse window units. Project specifications come in a complete bound set and each division of work has a specific number. Because the greenhouse window units were a specialty item, they were in the speciality division. Complete copies of the specifications and drawings for a particular project are typically in the hands of all general contractors bidding on the project, as well as the architect. Subcontractors can review plans and specifications through these sources. They can also review them at the Builder's Exchange, or through the Dodge Report, which provides information on projects for a fee.
The specifications Reenan sent Creative were the particular pages dealing with the requirements for the greenhouse windows. Additionally, Reenan sent elevation drawings of the units. Creative's sales representative, Bill Hansford, then prepared and gave a bid to Staffco about two hours before Staffco's overall bid on the project was due. Consistent with procedures generally followed in the construction industry during bidding, Reenan incorporated this bid as one of many when making the overall bid ($1,396,000) for the project. Creative's bid was one of two Reenan received for the greenhouse windows, but the other bidder used windows from a different manufacturer. Consequently, Reenan decided not to use that bid, which was also higher than the Creative bid. At least fifteen different trades sent in subcontract bids the day the overall bid was due, and many trade areas had multiple bidders. According to Reenan, about 99% of subcontract bids come in on the due date for the overall bid, and the general contractor relies on subcontractors to prepare bids complying with the specifications and drawings for the project.
The Masgig specifications listed the required greenhouse window unit as "Model CLT 3GG," but did not explicitly mention vents. However, the elevation drawings showed an inverted "V" on some sections, meaning that the unit would contain an awning or operable vent. In the bid submitted to Staffco, Creative said it would supply and install three Model CLT 3GG sunrooms of the size indicated in the specifications, again for a price of $14,498. After the bid arrived, Reenan checked the model number on the bid and noted that it matched the model number in the specifications. Reenan testified that she had no reason to believe Creative's bid was inaccurate, since the model numbers matched.
On September 15, 1997, Staffco was awarded the contract. Staffco then sent Creative a standard subcontract agreement dated September 22, 1997. Construction was scheduled to start October 1, 1997, and was projected to last through the following summer, or until about August 22, 1998. Typically, after a bid is awarded, Staffco requests shop drawings from subcontractors, because the drawings have to be sent to the architect. However, because the greenhouse window units were going to be installed the next summer, Reenan waited until January, 1998, to call Creative about the shop drawings. At that time, Reenan spoke with Tom Kitchem of Creative, and learned that the shop drawings had not been sent because of a problem. According to Kitchem, Hansford had not understood that the inverted "V" on the elevation drawings indicated an awning or operable vent. As a result, Hansford made a mistake in the bid price. Kitchem also told Reenan that Hansford no longer worked at Creative because of the mistake. And finally, Kitchem said Staffco would have to pay $2,500 more for the greenhouse window units.
Reenan and Staffco's general manager, Mike Stafford, then called Dale Thornberry, Creative's President, to discuss the matter. According to Reenan, Thornberry did not give a reason for the price difference, but simply said that the awning or vented windows would cost $2,500 more. Both Reenan and Stafford testified that Stafford offered to split the difference to resolve the matter. However, Thornberry refused and told Stafford to go ahead and sue. Following this conversation, Staffco obtained additional bids for the work, but was required to pay $2,931.98 more than the amount of Creative's original bid.
Hansford, the discharged Creative employee, also testified at trial. Hansford indicated that he was not familiar with bidding in a public school situation. As a result, he asked Dale Thornberry for help with the bid. Hansford sent Thornberry all the information, including the elevation drawings, and Thornberry calculated the pricing. Hansford then prepared the bid on Creative's standard proposal form. Hansford testified that he was told he had made a mistake in pricing and was discharged from Creative several weeks after the bid was submitted. However, he denied making the mistake, and instead blamed Thornberry.
By contrast, Thornberry took the position in his testimony that no mistake had been made. While Thornberry admitted that Creative had the specifications and elevation drawings for the window units, he claimed that Creative's bid was not intended to conform to the plans and specifications. Thornberry testified that he only bids "per plans and specs" if he has a full set of blueprints or a full specification book, which he did not have in this case. In the absence of this information, Thornberry specifically lists what he is bidding in a very clear and detailed manner, to avoid a misunderstanding. Thornberry's position was that he had bid in such a manner on the Masgig job by listing the model number and no options. The awning or vented windows were an optional item, and, in Thornberry's opinion, constituted an addition to the bid.
After reviewing the record, we find competent, credible evidence to support the trial court's judgment. As we mentioned, the trial court found that Staffco had reasonably assumed that Creative's bid was based on the specifications and plans for the Masgig project. Consistent with normal practice in the construction industry, Staffco, as general contractor, solicited and received bids from many subcontractors and then incorporated the bids in its overall proposal. The data needed for an informed bid was in Creative's hands, and if Creative wished to qualify the bid in some manner, that fact should have been made evident. As was noted in Wargo, if the subcontractor does not want to be bound, it can expressly reserve the right to withdraw the bid or it can otherwise disclaim the intention to perform.26 Ohio App.3d at 5. However, Creative took no such steps in this case. Instead, Creative used the model number mentioned in the specifications, without qualification. Under the circumstances, any reasonable observer would conclude that the bid conformed to the requirements in the drawings and specifications. And finally, Staffco notified Creative within a few days of receipt of the bid that its offer was accepted by sending the subcontract agreement. Consequently, we agree with the trial court that Creative was required to perform the work for the price outlined in its bid.
As an additional argument against the application of estoppel, Creative says that Staffco's subcontract agreement attempted to alter substantial or material terms in the bid, such as the financing arrangements. According to Creative, the bid called for progress payments, while the subcontract agreement conditioned payment on job completion and satisfaction of other contract conditions. Again, this was a factual dispute resolved by the trial court in Staffco's favor. Further, competent, credible evidence supports the court's decision. Reed,125 Ohio App.3d at 439. Specifically, Staffco employees testified that the only issue Thornberry mentioned was the need for more money, and financing was never discussed. Apparently, the trial court chose to believe the Staffco employees. Furthermore, even Thornberry testified that his real concern was that this was a "plans and specs" contract. Consequently, even if the trial court had chosen to believe Thornberry, financing did not appear to be a material term.
Based on the above discussion, we find no error on the trial court's part, because the judgment was supported by some credible, competent evidence going to all the essential elements of the case.
 II
The second issue Creative raises is that the trial court abused its discretion by finding that Staffco reasonably interpreted the bid to include terms and specifications set forth in the specifications book. In this context, Creative focuses on the fact that the bid did not say it was "per plans and specs." Additionally, Creative points out that Staffco's employees did not have any idea what product was identified by the specific model number, nor did they know if options to the model number would increase their cost. In view of these facts, Creative argues that Staffco's employees could not have reasonably interpreted the bid to include the requirements in the specifications book. We think this argument misses the point.
A general contractor necessarily relies on the expertise of subcontractors and suppliers. If the architect for a project provides specifications and drawings, including the particular model number of an identified product, and an authorized supplier of that product then submits a bid using the same model number, without qualification, the general contractor is justified in concluding that the bid conforms to the specifications and drawings. Perhaps this point is too obvious for comment, but the very purpose of using subcontractors is the superior knowledge or expertise they offer.
In light of the preceding discussion, we find no evidence that the trial court abused its discretion, bearing in mind that an abuse of discretion means "more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219 (citations omitted).
Having found some competent, credible evidence to support the judgment and no abuse of discretion by the trial court, we overrule Creative's single assignment of error. Accordingly, the judgment of the trial court is affirmed.
GRADY, P.J., AND YOUNG, J., concur.
Copies mailed to:
Lowell T. Woods, Jr.
David J. Arens
Hon. Robert L. Moore